## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT N. RICE, JR., | ) | CASE NO. 4:05CV3082 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. The Court has carefully considered the record and the parties' briefs (Filing Nos. 11 and 12).

## PROCEDURAL BACKGROUND

The Plaintiff, Robert N. Rice, Jr., filed an application for disability benefits on November 14, 2002. (Tr. 60-62). The application was denied initially and on reconsideration. (Tr. 38-41, 44-47). On September 3, 2004, Administrative Law Judge Theodore Gotsch (hereafter the "ALJ") issued a decision finding that Rice was not under a "disability" as defined in the Act. (Tr. 14-19). The Social Security Administration's Appeals Council denied Rice's request for review. (Tr. 5-8). Pursuant to 42 U.S.C. § 405(g), Rice now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration. (Filing No. 1).

Rice claims that the ALJ's decision was not supported by substantial evidence. Rice claims that the ALJ failed to consider his limited intellectual functioning by improperly identifying his educational level as a high school graduate; improperly evaluated his

credibility; failed to properly determine his residual functional capacity ("RFC"); failed to analyze vocational evidence including the reports prepared by Karen Stricklett (Tr. 63-70; 326-28), failed to consider his diagnoses of mild post traumatic stress syndrome and mixed personality disorder, and failed to pose proper hypothetical questions to the vocational expert.   Rice also contends that the Administrative Appeals Council failed to consider additional evidence of his preexisting mental and cognitive impairments and his right side weakness resulting from a 1986 accident.

The Commissioner contends that the ALJ properly discounted Rice's testimony, made a determination of Rice's residual functional capacity based on substantial evidence in the record, and properly included only those facts that the ALJ found to be supported by substantial evidence in the hypothetical question to the vocational expert.   The Commissioner asks this Court to find that the ALJ's credibility determinations were properly made, to conclude that the findings are based on substantial evidence, and to reject Rice's appeal.   Upon careful review of the record, the parties' briefs, and the law, the Court concludes that the ALJ's finding of no disability is not supported by substantial evidence on the record as a whole, and that this matter must be remanded for further proceedings.

## FACTUAL BACKGROUND

Rice seeks disability benefits following two work-related accidents that resulted in an amputation of his left arm and a burn to his right foot.  Rice is right-hand dominant.  (Tr. 347).  He was born on August 7, 1968, and he is now 37 years old.  The record indicates that in 1986, at age 18, Rice was in a serious motorcycle accident.  Rice was in a coma for six days after the accident, and thereafter, he was hospitalized at the Madonna Rehabilitation Hospital for three and a half months.  There is evidence that he suffered a

2

closed head injury as a result of the accident, and that Rice experiences residual right-side weakness. (Tr. 125-26). Medical records associated with Rice's condition following this accident are the subject, at least in part, of the Plaintiff's motion to submit additional evidence. (Filing No. 8).

Even before the motorcycle accident, Rice was in special education classes and worked with resource teachers. (Tr. 360). In connection with the preparation of his individual education plan in 1984, when Rice was 16 years old and in ninth grade,[1] one evaluation indicated that Rice qualified for assistance as handicapped under the diagnostic category of Educable Mentally Handicapped. (Tr. 289; 288-94). When he was administered a Wechsler Intelligence Scale for Children, Revised, in 1984, Rice had a full scale score of 78, placing him in the borderline range.[2] Rice graduated from high school in 1988, and he held various manual labor jobs over the next 14 years until he was terminated from Fisher Foods Company ("Fisher") for failing a random drug test in April 2002. (Tr. 361; 66).

On March 26, 2001, while Rice was working for Fisher, the jacket he was wearing became entangled with an auger. When Rice attempted to free the jacket, his left arm was pulled into the auger. Surgeons later amputated the left arm, after which Rice successfully completed rehabilitation at Madonna Rehabilitation Center in Lincoln, Nebraska. About one month after the accident, Rice returned to work at Fisher in a modified job in a part-time capacity, and eventually, he worked his way back to "pretty much full-time in the modified job." (Tr. 356).

---

[1] Two years *before* the motorcycle accident.

[2] Rice's full scale score when the test was administered in 1981, at age 13, was 74 (with a variance of plus or minus 6). (Tr. 295; see also 287-300)

Rice's jobs at Fisher involved the processing of chicken and beef broth.  Prior to his amputation, Rice was employed as a "bone crusher" feeding chicken and beef bones into a machine, and he was on his feet approximately 8 hours per work day.  Upon his return to work following the amputation, Rice was employed as a "bone cooker," which he described as monitoring the cooking of chicken broth.  This modified job allowed him to sit and stand alternatively throughout an 8-hour work day, and Rice estimated that he sat for approximately half the time.  (Tr. 352).

Rice was working as a bone cooker at Fisher on January 18, 2002, when he burned his right foot with scalding water.  Fisher allowed him to return to work as a bone cooker following the burn injury part-time for four hours per day, which lasted approximately two weeks.  After that, he was allowed to return to a full-time shift, but that lasted for only a week before he was terminated.   (Tr. 352, 364).  Thus, according to Rice, following his amputation on March 26, 2001, the longest amount of time he was required to stand for work was four hours, and that was with sitting breaks whenever he desired.

 On April 1, 2002, Rice was fired because he failed a random drug test.  Rice believes that the employer gave him the drug test to establish a basis for firing him that was independent of his injuries.  Rice also admits to regular marijuana use, but he denies abusing controlled substances because he views his use of marijuana as moderate.

**Medical, Psychological and Vocational Evidence**

The physicians and rehabilitative physical therapists who treated Rice for the left upper extremity amputation stated that he made a very good recuperation following the accident and subsequent surgery.  Rice concluded the physical therapy sessions in three weeks, rather than in the three months that was anticipated immediately following the

4

surgery. (Tr. 116-49; 248-50; and Ex. 2F).  I note that in a report dated January 30, 2001, following a CT scan of Rice head, the physician notes "the CT of the head without contrast shows moderate atrophy greater than would be expected for age 32."  (Tr. 143).

On January 18, 2002, Rice's foot was burned by steam and hot water at work.  Rice was treated for his burn injury by physicians at the St. Elizabeth Burn Center.   On December 4, 2002, the physicians who treated him for the burn released him from further medical care, finding that he had good flexion and extension and full range of motion in his right foot.  (Tr. 252).  Rice's treating physicians for his burn have not provided any opinion regarding Rice's functional limitations, if any, as a result of the burn injury.  (Tr. 251-78; Ex. 2F).

On March 10, 2003, a physical residual functional capacity assessment was performed by a consulting physician.  I note that Rice was assessed to be able to stand or walk about six hours in an eight-hour workday as indicated by a check mark on the form. The only explanation for that finding, however, is reference to the medical records establishing that in September 2002, Rice's treating physicians for the burn injury determined that he had full range of motion in the right foot and that extension and flexion of the foot showed no deficits.  (Tr. 252). The consulting physician's RFC assessment makes no mention of testing methods relative to the walk and stand functions, nor to the amount of time Rice was observed on his feet, if at all.  There was no reference to Rice's right side residuals from the 1986 accident.  The consulting physician does note that medical records from March 26, 2001, which was before the burn to the right foot and immediately after the amputation, indicate that Rice had 5/5 strength in the lower right extremity.  (Tr. 281-286).

5

In July 2003, the Disability Determination Section referred Rice to psychologist William Stone, Ph.D., for evaluation.   As part of the evaluation, Dr. Stone conducted a lengthy interview of Rice, and he administered the Wechsler Adult Intelligence, Scale III, test to Rice.  Rice's score for IQ was 74.  Dr. Stone determined that Rice's score put him in the "borderline" category.  A score of 69 and below categorizes the subject as mentally retarded.  Dr. Stone also diagnosed Rice as suffering from mild post traumatic stress disorder, mixed personality disorder in that he "has difficulty appreciating the point of view and probable reactions of others," and cannabis abuse that is ongoing.  Despite these findings, Dr. Stone determined that Rice is capable of sustained concentration and attention and is capable of understanding and remembering simple instructions.  Dr. Stone found that Rice is capable of relating appropriately to co-workers and supervisors and of adapting to ordinary, day to day changes in his environment.  (Tr. 301-06).

With regard to his employability, Rice has presented for two consultations.  A report dated November 19, 2002, from vocational rehabilitation specialist Jan Husen-Stortnebecker, states:

> Career Scope assessment was attempted on this individual.   While completing the interest section it became apparent that this individual had a great deal of difficulty reading.  When asked to read basic sentences, he missed a number of the words in each line.  When questioned, he reports that he received assistance in high school. While working on the aptitude section response time is crucial.  Robert was unable to respond quickly enough to a question that the section would end before even one question would be answered.  At that point, this evaluator elected to terminate the assessment.  Given his reading and response limitation it would appear that any results obtain [sic] would not be valid.  Would recommend that a psychological assessment occur to further and diagnosis [sic] his various limitations.

(Tr. 247).

6

Karen Stricklett, a rehabilitation specialist, also assessed Rice's employability in a report dated April 16, 2004.  (Tr. 63-70).  Stricklett stated that she had not received Rice's high school transcript, but she anticipated that "the fact that he was able to obtain a high school diploma does not accurately represent his cognitive and or functional levels." (Tr. 66; 63-69).  Stricklett found it important that Rice was involved in a significant accident in 1986 that resulted in a traumatic brain injury with residuals.  She concluded, based on educational testing results she reviewed, that Rice "has fairly significant deficits with respect to reading and writing."  During her evaluation of Rice, Stricklett found it difficult to keep Rice on track.  She found his cognitive deficits to include, based on the Madonna Rehabilitation Hospital Records, "slow speech and short/long term memory loss."  (Tr. 69).  She stated that in addition to "his intellectual and cognitive deficits," he had other impairments including the lost use of his left, upper extremity, and difficulty with prolonged standing and walking associated with his right foot injury.  (Tr. 69).  Stricklett stated that if Rice is permanently restricted to sedentary work as a result of his inability to stand or walk for prolonged periods of time, it was her opinion that he would be competitively unemployable.  From a cognitive standpoint, Stricklett stated that Rice would be excluded from performing sedentary jobs of a semi-skilled or skilled nature.  From a functional standpoint, she concluded that Rice would be precluded from performing unskilled sedentary jobs, most of which exist in production and /or manufacturing settings, given his inability to stand for long periods.

After the administrative hearing, Stricklett prepared an addendum to her report reflecting her opinions after her review of the administrative hearing transcript. (Tr. 326-28). She questioned the ALJ's finding that Rice has intellect equal to a high school graduate.

7

She also expressed doubt as to whether Rice could pay sufficient attention to the job of security surveillance monitor given his difficulty staying on task that she personally had observed, and she questioned whether he could perform the work of an usher, which require a person to be able to stand for six to eight hours per day.  Stricklett noted that the Madonna Rehabilitation Hospital records contain a reference to Rice's right-side weakness as a residual of the 1986 accident.

### Vocational Expert's Testimony

Vocational expert Gail Leonard ("VE") also testified at the hearing.  (Tr. 371-394).  The ALJ relied on the consultant medical physical functional capacities evaluation and Dr. Stone's psychological findings in formulating the hypothetical question to the ALJ.  (Tr. 16).  The hypothetical question posed to Leonard included assumption of a high school educational level, the ability to stand and walk for six to eight hours, that he is capable of relating to co-workers and supervisors on one hand but that he also had moderate limitation in his ability to accept instruction and to respond appropriately to criticism from supervisors.   In a subsequent hypothetical, the ALJ changed one limitation, that the claimant had the ability to stand and walk from two to four hours.  (Tr. 381, 389).  Based on these hypothetical questions, the VE stated that a person with the limitations the ALJ found credible could perform the work of an usher, as an example of a light-duty position, and that he could perform the work of a surveillance system monitor and a telephone solicitor, as examples of sedentary positions.  (Tr. 372-94).  On cross-examination, Rice's counsel asked whether the job of a surveillance system monitor would require attention to detail and the ability to stay on task, and Leonard agreed that it would.  (Tr. 391-92).  Leonard also agreed that the usher job would require the ability to stand or walk for six to

8

eight hours per day, and that it might require some light cleaning, but he believed that Rice could perform the light cleaning with one hand.  Leonard also noted that telemarketers are required to be able to read scripts, but he opined that, given the repetitive nature of the scripts, a person with lower readings skills would be able to perform the job.

Also on cross-examination, Rice's counsel asked the VE to consider additional limitations to the hypothetical, including that the person had a full scale score of 78 of the Wechsler Intelligence Scale, that the person had difficulty reading, had slow speech, had been diagnosed with possible post traumatic stress disorder, mixed personality disorder, and had been identified as an individual that had decreased attention and who is occasionally distracted.   Adding those additional non-exertional limitations to the hypothetical question, the VE seemed unprepared or unable to respond without additional information as to whether the additional limitations would make the hypothetical claimant unable to perform the jobs previously identified by him.

**ALJ Findings**

The ALJ determined that Rice has engaged in substantial gainful work activity since the onset date of March 26, 2001, or alternatively, since January 18, 2002.  (Tr. 30).  He found that April 1, 2002, was the date he last became unable to work.  The ALJ found that the medical evidence establishes that Rice has status post left upper extremity amputation, mild post traumatic stress disorder, mixed personality disorder and marijuana abuse.  The ALJ concluded that Rice does not have an impairment or a combination of impairments listed in or equal to one in Appendix 1, Subpart P. Regulations No. 4.  The ALJ determined that Rice could not perform his past relevant work.

The ALJ determined that Rice has the residual functional capacity to perform light exertion with left arm prosthesis assisting the right hand/arm, with the following limitations: no crawling, occasional climbing, stooping, kneeling, crouching and no reaching, handling, fingering of the left upper extremity, avoidance of working at heights, around moving machinery, hazardous environments, operating vibrating equipment or in extreme cold temperatures.  The ALJ found Rice also has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace with no repeated episodes of decompensation, each of extended duration.  Accordingly, the ALJ found Rice is able to perform simple, repetitive tasks with moderate limitation in his ability to accept instructions and respond appropriately to criticism from supervisors.   (Tr. 17).

The ALJ also determined that Rice has a "high school education," citing to 20 CFR § 404.1564. (Tr. 18).  The ALJ concluded that Rice has not acquired work skills that are transferable to the skilled or semi-skilled work activities.  The ALJ recognized that the left upper extremity limitations do not allow Rice to perform the full range of light work, but he found that there are significant jobs in the national economy that Rice could perform such as an usher (light exertion and unskilled) and a surveillance system monitor (sedentary exertion and unskilled).  Accordingly, the ALJ determined that Rice is not under a disability as defined in the Act.  (Tr. 18).

In reaching that conclusion, the ALJ discounted the credibility of Rice's own testimony, and he relied on the testimony of consultants, including the medical consultant and psychologist William Stone. The ALJ noted that the consultants' opinions were not disputed by any of Rice's treating physicians.  The ALJ also relied on the testimony of the

10

vocational expert in concluding that there were light duty jobs available in the local and national economy that Rice would be able to perform given his residual functional capacity.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirm that decision. *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001)(quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir.1998)). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "Disability" Defined

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

11

impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).  The physical or mental impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

**Educational Level**

Having reviewed the record, I conclude that it is necessary to remand this matter for further proceedings because the ALJ's hypothetical to the VE included the assumption that Rice had a high school education.  There is significant and substantial evidence that detracts from that conclusion and almost no evidence in the record, except for the fact that Grand Island High School graduated Rice in 1988, to support that Rice has achieved a high school educational level as defined in 20 C.F.R. § 404.1564.[3]

As part of his individual education plan in 1984, Rice was categorized as "educable mentally handicapped."  Rice reads at a primary school level; even now, his reading level is so poor and his response times are so slow that a vocational employment specialist decided not to administer an evaluative test for him because the results would not have

---

[3] "High school education and above. High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work." 20 C.F.R. § 404.1564.

12

been valid.  (Tr. 247).  Rice suffered some type of traumatic brain injury in 1986, and he missed three and a half months of school that year.  In high school, Rice's IQ was reported to be approximately 78, and Rice scored a 78 on the Wechsler Adult Intelligence scale that was administered to her by Dr. Stone in 2003.  A score of 78 places Rice in the category of borderline educational functioning.  *See Swope v. Barnhart*, 436 F.3d 1023, 1024 (8th Cir. 2006); *Hutsell v. Massanari*, 259 F.3d 707, 709 n.3 (8th Cir. 2001)("Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range while mental retardation is a score of about 70 or below.")  There is also evidence of a head CT scan taken in March 2001 that showed atrophy at a level greater than expected for a person of Rice's age at the time.  In addition, in Karen Stricklett offered her opinion that Rice is not functioning at a high school educational level, has significant cognitive deficits, and is unable to perform semi-skilled or skilled work.

I conclude that there is substantial evidence in the record as a whole that supports a finding that the highest educational level that Rice has achieved is that of "marginal education" as defined in § 404.1564, and I leave open the possibility that Rice's educational level may be lower.  "Marginal education" is defined below:

> (2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

20 C.F.R. § 404.1564. This can be compared and contrasted to illiteracy,[4] a limited education[5], and a high school education, all of which are defined in section 404.1564.

Rice's intellectual limitations should have been included in the hypothetical questions posed to the VE.  *Swope,* 436 F.3d at 1024-25; *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir. 2005); *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir. 1997).  Because Rice's intellectual limitations were not included, the ALJ's hypothetical question to the VE was inadequate, and may have resulted, as the same omission did in Swope, in the VE identifying jobs that are outside of Rice's ability to competently perform them, for example, the surveillance system monitor position.  *See* Stricklett report; and *Swope*, 436 F.3d at 1025.  However, that is for the VE, and not the undersigned, to consider in the first instance.

**Walking, Standing, Impairment to Right Side**

In addition to the ALJ's determination of Rice's educational level, I conclude that substantial evidence does not exist in this record to support the ALJ's finding that Rice can engage in light exertion work with the limitations identified by him.  One of the main distinctions between the ability to perform light work and sedentary work is a claimant's

---

[4] "Illiteracy. Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling."

[5] "Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."

ability to stand for an extended length of time.[6]   On remand, the ALJ must address whether there is sufficient medical evidence developed in this record to make a determination about Rice's ability to stand and walk for an extended amount of time.

In this case, the ALJ completed all five steps in the sequential evaluation process.[7] In determining Rice's RFC as a prerequisite to addressing the fifth step, the ALJ determined that Rice could stand and walk for six to eight hours of a workday.  In reaching this decision, the ALJ discounted Rice's testimony.  Rice objects to the ALJ's failure to acknowledge that Rice cannot stand for more than one or two hours at a time.

Residual functional capacity ("RFC") is defined as what the claimant "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).  RFC is an assessment based on all medical and other evidence, including medical history, observations by treating or examining physicians or psychologists, family and friends; medical records; and

---

[6] *Compare* the descriptions of "sedentary work" and "light work:" "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying . . .. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met," 20 C.F.R. § 404.1567(a) *with* "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.. . . " 20 C.F.R. § 404.1567(b).

[7] In determining disability, the Act follows a sequential evaluation process.  *See* 20 C.F.R. § 416.920.  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.*  If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability.  *Id.*

15

the claimant's own description of his limitations. *Id.* 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c); *McKinney v. Apfel,* 228 F.3d at 863-64.

There's much agreement about Rice's physical limitations that are reflected in the ALJ's RFC analysis, particularly with regard to the effect of his right upper extremity. However, I conclude that substantial evidence in the record does not support the ALJ finding that Rice could stand and walk for six hours in an eight-hour work day. (Tr. 15, 17). In reaching his determination, the ALJ considered the consulting doctor's functional capacities evaluation, medical records generated before the burn injury relating to strength testing, and medical records generated after the burn injury indicating that Rice had regained full range of motion in his right foot and good extension and flexion in his right foot. The ALJ specifically rejected Rice's testimony and evidence from his sister-in-law relative to his stamina in walking, balance, and strength.

**Credibility Determination.**

In determining Rice's RFC, ALJ stated that he did not rely on Rice's testimony as establishing greater physical limitations than those he found because of Rice's "inconsistent statements." In explanation, the ALJ stated:

> the record showed that his condition was stable; he was working with functional reaching and working with standby for his car [sic] and functional transfers and a small base quad cane. He admitted that he stopped working on April 1, 2002, not due to his disability, but because he was fired for failing a UA screening which was positive for marijuana. His daily activities are also inconsistent with his allegations. At the hearing, he testified that he lived with a roommate, he cooked, vacuumed, did his laundry, mowed the yard as needed and took his nephews to the park. His sister-in-law reported that he watched television, attended family dinners or barbecues, took care of his personal needs, took care of his cat and socialized with friends and family members.

16

(Tr.16).   Based on those findings, the ALJ found that "the claimant's inconsistencies negatively impact his credibility and do not permit reliance on his statements."

It is well-established that a hypothetical question need only include those impairments and limitations found credible by the ALJ.  *See Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005)*, Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004). Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.  *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall v. Massanari,* 274 F.3d 1211, 1218 (8th Cir. 2001).  The issue in this case is not so much about pain, but rather, it is about Rice's stamina, balance, and strength with regard to standing and walking, which is likely related to Rice's episodes of right-side weakness.

The *Polaski* standard is the guide for credibility determinations.  It provides, in relevant part:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  . . . The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.

17

> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d at 1322.[8]

---

[8]    Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record.  Ruling 96-7p provides that the ALJ must consider such factors as:

> * The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

> * The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

> * The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).

18

During the hearing on July 20, 2004, Rice was asked questions about his ability to stand and walk.  When asked, "[a]nd standing and walking, do you have any difficulty doing that?"  Rice testified, "Well I can't walk for long – for a real long distance because my right leg, it'll . . . just start dragging then after awhile.  I don't know."  He also testified that "every now and then . . .  I'll be walking and its just like my ankle will – like, I'll twist my ankle, just by stepping."  When asked whether he has any problem with standing, Rice testified, "not if it ain't for a real long time."  When the ALJ tried to have him define "a real long time," Rice stated that he doubted he could stand for two hours at a time, but maybe he could for one hour at a time.  Rice doesn't understand the physical cause of his problems, only that he "just start[s] leaning." . . .  "It's like my leg will get tired and like it don't want to support my body weight."  (Tr. 350-51).  He testified that the accident in 1986 "kind of messed up my right side."  (Tr. 352).  And when asked, he said that he had experienced problems with his right side, more or less, since 1986.

Rice also testified that after the amputation, he returned to work in a modified job, in which he was permitted to alternate sitting and standing at will.  Rice stated that in an eight-hour shift, he sat about half that time – four hours.  When Rice returned to this job after his right leg injury, he worked for two weeks in a part time capacity, working four hours per day, which means that he was standing approximately two hours a day.  He returned to the eight-hour shift in the modified job for only one week before his termination.  Thus, Rice's testimony about his ability to stand while working reflects that he was standing, at the most, only four hours per day. (Tr. 352, 364).

This testimony is consistent with the comments Rice included on the Adult Disability Report dated October 16, 2002, more than two years before the hearing.  (Tr. 76-85).  The

19

conditions and limitations he described included "lose balance easily." " Problems standing long periods." and "balance problems." (Tr. 77). Rice's testimony is also consistent with the statement that his sister-in-law provided in connection with his application (Tr. 111). She stated that he goes for walks "once in a while, . . . it takes him a long time to walk, He walks really slow." (Tr. 110). With regard to his activities, she stated that he can do a few chores "but usually someone is always with him," that he watches a lot of television, and that she usually does his laundry at her house. (Id.). Ms. Rice also stated that, "I think he has a short attention span if you lose his interest." (Tr. 112).

Rice also testified at the hearing that he can sweep, vacuum, do his laundry, and mow every now and then, noting that he can take breaks. He testified that he can take his niece and nephew to the park, but doesn't play games or ball with them, but can push them on a swing.

Mindful of the Eighth Circuit Court's oft-repeated admonition that about drawing adverse conclusions about a claimant's ability to simple household chores, I find no inconsistencies in Rice's statements. The Eighth Circuit Court has often referred to this excerpt:

> [W]e remind the Secretary that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc). Substantial gainful activity means the performance of substantial services with reasonable regularity either in competitive or self-employment. *Markham v. Califano,* 601 F.2d 533, 534 (10th Cir.1979). The ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity.

20

*Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989).  *See also Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir.1996)(finding making bed, preparing food, performing light housekeeping, grocery shopping, and visiting friends, unpersuasive reasons to deny benefits) and *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir.1995 ) (performing activities such as light housework and visiting with friends "provides little or no support for the finding that a claimant can perform full-time competitive work.")

Rice testified that he has trouble keeping his balance, standing for long periods of time, and that his leg gives out on him and gets fatigued.  He testified that he can probably stand and walk for an hour, but he doubts that he can sustain that for two hours.  He said he has experienced right-side weakness since the 1986 accident.   None of these statements is inconsistent with his ability to perform some household chores or engage in other domestic and social activities. Rice never suggested that his condition was unstable, or that he was fired for anything other than his failure in passing a UA – though he ascribes ulterior motives to his former employer in the administration of that test.  I conclude that the ALJ erred in discounting Rice's testimony based on inconsistent statements.

In addition, I find that there is medical evidence in the record to support Rice's testimony of his inability to stand or walk for long periods of time.  Specifically, in the "past history" notes prepared by Dr. Lew Birkmann, who provided a psychiatric consultation during Rice's hospitalization for the amputation, he noted: "[Rice] was hospitalized here for an interval with intra cranial pressure monitoring, improved, spent some time at Madonna, and apparently had a mild tendency to slight residual paresis on the right side," and in the "diagnostic impression" notes, Dr. Birkmann stated, "[t]here is a past history, also, of a closed head injury from motorcycle accident in 1986, with slight right side residual."

(Tr. 125-26).  As referenced in Stricklett's report, there are also nursing notes and rehabilitation specialist notes that reflect similar history.

I conclude that substantial evidence in the record does not support the ALJ's determination of Rice's residual functional capacity because it did not provide any limitation relative to his ability to stand and walk for long periods of time.  It may be true that the consulting physician's opinions did not conflict with the treating physicians' opinions, but that is because the treating physicians had not formulated an opinion on Rice's functional capacity.  I also observe that the consulting physician's opinion on the subject directly conflicts with Rice's testimony and the actual ability to work he demonstrated after returning from the amputation injury in 2001.  Stricklett questioned the sufficiency of medical evidence on the subject.

The Court of Appeals for the Eighth Circuit has stated:

Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence,"  *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Singh,* 222 F.3d at 451. "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

*Lauer v. Apfel*, 245 F.3d 700, 703-04 (8th Cir. 2001).  The sufficiency of evidence becomes more important, where, as in Rice's case, the claimant established that he was unable to do past relevant work under step four of the sequential disability process.  *Compare Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)(step four established) *with Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir. 2004) (step four not established).  On

22

remand, after the additional evidence relative to the 1986 injury is considered, the ALJ must determine whether additional evidence must be developed on the issue.  In *Stormo v. Barnhart*,  377 F.3d 801, 806 (8th Cir. 2004), the Court stated:

> Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in the case. *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir.2004). The ALJ must neutrally develop the facts. *Id.* He does not, however, have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. *Id.* at 839.

### *Question Posed to Vocational Expert*

An ALJ's hypothetical questions to a VE are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited.   *Pearsall,* 274 F.3d at 1220. Because I find that the ALJ erred in his determination of Rice's educational level; because I find that the ALJ improperly discounted the credibility of Rice's testimony relative to how long he can stand and walk, and because I find that additional evidence should be allowed and/or developed with regard to any right side residual paresis Rice may experience, I conclude that the questions posed to the vocational expert were improper.  I also note that the hypothetical questions did not include the undisputed diagnoses made by Dr. Stone of mild post traumatic stress syndrome and mixed personality disorder, either one of which may have changed the VE's opinions regarding Rice's ability to perform the jobs he had identified.   Additional testimony from the vocational expert will be required on remand.

Finally, I add that while it is true that Rice engaged in substantial gainful employment after his amputation and again after his burn injury, the work to which he

23

returned at Fisher is work considered to require bilateral abilities.  Proof that the "bone cooker" job should be performed by a person who has two functioning arms and hands can be found in the facts surrounding Rice's burn injury.  Rice was unable to break his fall or push his boot off while simultaneously keeping a hold of the steam-spewing hose.  (Tr. Rice test.)  Accordingly, that Rice was terminated from this particular job based on a urine analysis that tested positive for marijuana, is not basis for denying him social security benefits if he is otherwise entitled to them.

## Conclusion

I will remand this case because I conclude that the ALJ's decision is not supported by substantial evidence.  I find that the ALJ's determination that Rice had a high school education was not supported by substantial evidence.  This alone is sufficient reason to remand for further consideration by the VE.  However, I also conclude that the ALJ had no reasonable basis for discounting Rice's credibility, that the record was not sufficiently developed as to Rice's functional capacity to stand and walk, and that the vocational expert must be provided with a proper hypothetical, in light of these findings and conclusions.

For these reasons, the Commissioner's decision is reversed, and the matter is remanded for further proceedings consistent with this memorandum.

IT IS ORDERED:

1.      The Plaintiff's Motion for Additional Evidence to be Presented to the Commissioner (Filing No. 8) is granted, and Plaintiff is directed to offer the new evidence in the proceedings on remand;

2.      The appeal is granted;

3.      The decision of the Commissioner is reversed, and the matter is remanded

for further proceedings consistent with this Memorandum and Order; and

4.      The Clerk of the Court shall terminate this case for statistical purposes.

DATED this 22nd day of May, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge